**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                **Plaintiff,**<br><br>   v.<br><br>PERSONAL REPRESENTATIVE OF THE ESTATE OF JOHN R. BRODACKI, III and CASTLE HILL FINANCIAL GROUP, LLC,<br><br>           **Defendants.** | Civil Action No. 26-CV- |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants the Personal Representative of the Estate of John R. Brodacki, III (the "Estate"), and Castle Hill Financial Group, LLC ("Castle Hill"):

**SUMMARY**

1.      This suit arises from the actions of John R. Brodacki, III ("Brodacki"), prior to his death on or about March 23, 2026.  Brodacki and his company, Castle Hill were investment advisers who owed fiduciary duties to their advisory clients.  Brodacki and Castle Hill breached those fiduciary duties by engaging in a fraudulent scheme, using deceptive devices, and making and using false and misleading statements to misappropriate and misuse money from certain of their advisory clients.  In total, the Commission estimates that Brodacki and Castle Hill obtained over $1.8 million to which they were not entitled from at least 18 of their advisory clients between at least June 2018 and September 2025 (the "Relevant Period").

2.      Brodacki and Castle Hill fraudulently induced at least 18 of their advisory clients, many of whom were elderly, retired or seriously ill, to transfer money to Castle Hill.  Brodacki

told these advisory clients that their funds would be used to make investments for their benefit and/or the benefit of their relatives.

3. Instead of making such investments to benefit the advisory clients and their relatives, Brodacki and Castle Hill misappropriated those funds, and used the funds to pay Brodacki's own personal and business expenses, to make repayments to other advisory clients, and to make payments to Brodacki's own family members. Those personal expenses included lavish meals, membership fees to exclusive social clubs, travel, and tuition for Brodacki's family members. Brodacki's and Castle Hill's actions thus have some of the hallmarks of a Ponzi scheme.

4. In furtherance of their scheme, Brodacki and Castle Hill provided some of these advisory clients with fabricated account statements showing the purported value of the investments they claim to have made for these clients.

5. Some of these advisory clients sought and obtained partial repayments of the money they sent to Castle Hill. After deducting those partial repayments of approximately $162,750, the Commission estimates that Brodacki and Castle Hill misappropriated approximately $1.68 million from the advisory clients they targeted in their scheme.

6. As a result of the conduct alleged herein, Brodacki and Castle Hill violated, and unless Castle Hill is restrained and enjoined, it will continue to violate, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§80b-6(1), (2)].

7. Based on these violations, the Commission seeks from Castle Hill: (1) permanent injunctions enjoining it from engaging in the transactions, acts, practices, and courses of business of the type alleged in this Complaint in violation of the federal securities laws; and (2) civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)]. The

Commission seeks from both the Estate and Castle Hill disgorgement of ill-gotten gains from the unlawful conduct set forth in this Complaint pursuant to Sections 21(d)(5) and (7) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u(d)(5), (7)], together with prejudgment interest thereon, and such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§80b-9(d), 80b-14].

9.      Venue is proper in this Court pursuant to Section 214 of the Advisers Act [15 U.S.C. §80b-14] and 28 U.S.C. §1391(d) because, among other things, certain of the acts, practices, transactions and courses of business constituting the violations alleged in this Complaint occurred within the District of Massachusetts, and because Brodacki resided and died in Massachusetts and Castle Hill's principal place of business was in Massachusetts during the Relevant Period.

10.      Brodacki and Castle Hill directly or indirectly used the mails or the means or instruments of transportation or communication in interstate commerce, including the internet and the telephone, in connection with their business as investment advisers and the conduct described in this Complaint.

11.      Brodacki's and Castle Hill's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

12.      Brodacki, age 49 at the time of his death, resided in Longmeadow, Massachusetts. Brodacki died on or about March 23, 2026.  During the Relevant Period, Brodacki was the

founder and CEO of Castle Hill.  Brodacki worked in the financial advisory area from 2001 until the time of his death.

13.     During the Relevant Period, Castle Hill was a Massachusetts limited liability company, solely owned by Brodacki, with a principal place of business in Longmeadow, Massachusetts.  At times during the Relevant Period, Castle Hill also maintained an office in Newton, Massachusetts.  Castle Hill was involuntarily dissolved as a corporation by the Commonwealth of Massachusetts as of December 31, 2025.

## FACTUAL ALLEGATIONS

### Defendants' Business as Investment Advisers

14.     From December 2017 until July 11, 2025, Brodacki and Castle Hill were not directly registered with the Commission as investment advisers.  Instead, Brodacki was an investment adviser representative of a Commission-registered investment advisory firm (the "Registered Adviser"), and Castle Hill was one of the independent financial advisors through which the Registered Adviser operated.  During that period, Brodacki's and Castle Hill's investment advisory business was supervised by the Registered Adviser and they were subject to the policies and procedures established by the Registered Adviser.

15.     During the period that Brodacki and Castle Hill did business through the Registered Adviser, they acted as investment advisers to approximately 110 advisory clients and had approximately $24.5 million in assets under their management.

16.     Typically, Brodacki's and Castle Hill's relationships with their advisory clients were documented in "Advisory and Investment Management Agreements" or "Investment Management Agreements" (collectively "Advisory Agreements") between the client and the Registered Adviser d/b/a Castle Hill.

17.     Under those Advisory Agreements, clients maintained brokerage accounts with a large brokerage firm that served as the custodian for their assets (the "Custodian") and all of their investment assets were to be invested through their account at the Custodian, where they would be managed by Brodacki and Castle Hill as their investment advisers.  In exchange for those advisory services, the Advisory Agreements required each client to pay quarterly fees based on the total amount of their assets under management at the Custodian.  Those fees ranged from .75% annually to 1.25% annually.

18.     The Advisory Agreements also stated that "[a]t no time will the Advisor accept, maintain possession or have custodial responsibility for the Client's funds or securities."

19.     The Registered Adviser established Compliance Guidelines that its investment adviser representatives, including Brodacki and Castle Hill, were required to follow.  Among many other compliance rules, Brodacki and Castle Hill were informed that "Clients need to be aware checks must be made payable to [the Custodian] and that you do not accept checks made out to yourself or your DBA," and that "[n]o advisory services, including Financial Planning, can be paid directly to you or your business DBA."  In addition, the Compliance Guidelines provided that Brodacki and Castle Hill "are not permitted to borrow or loan money to any clients for any reason."  The purpose of this policy was to ensure the safety of advisory clients' funds.

### Misconduct by Brodacki and Castle Hill

20.     On July 11, 2025, the Registered Adviser terminated Brodacki's employment and ended its relationship with Castle Hill.  In the public filing it made with the Financial Industry Regulatory Authority as a result of Brodacki's termination, the Registered Adviser stated that Brodacki was terminated for "violation of firm policies and procedures and industry regulations and conduct."

21.     The Registered Adviser terminated Brodacki's employment following its investigation that concluded that Brodacki improperly received funds from one of his clients directly into a Castle Hill account.

22.     Even after the Registered Adviser terminated its relationships with Brodacki and Castle Hill, Brodacki and Castle Hill continued to solicit and accept client funds for his purported investment advisory services.  He also continued to advertise his and Castle Hill's investment advisory services via Castle Hill's website and claimed it still had a relationship with the Registered Adviser.  This conduct continued until December 2025.

23.     Despite the terms of the Advisory Agreements with their clients and the Registered Adviser's policy requiring client assets to be held by the Custodian, Brodacki and Castle Hill fraudulently induced at least 18 of their advisory clients (during the Relevant Period) to make purported "investments" outside of their Custodian brokerage accounts by sending funds directly to Castle Hill.  Brodacki and Castle Hill promised these 18 advisory clients that they would use these funds to make various types of investments for the benefit of the clients and/or their relatives.  The clients understood that Brodacki and Castle Hill would manage these investments as their investment advisers and they never told them otherwise.  As examples, Brodacki and Castle Hill told some clients that they would invest in high-yield bank accounts, stocks, bonds, certificates of deposit, notes, or in securities of private companies.

24.     Brodacki and Castle Hill instructed these clients to send their funds for these alternative investments by check or by wire transfer payable directly to Castle Hill.  Brodacki and Castle Hill deposited those client funds into two Castle Hill bank accounts that Brodacki controlled.

6

25.    Rather than making the promised investments, Brodacki and Castle Hill misappropriated some or all of the money that their advisory clients sent directly to Castle Hill. Castle Hill's bank records demonstrate that little to none of the clients' funds it received for investment purposes was used to make investments.

26.    To date, the Commission has identified at least 18 advisory clients who sent investment funds directly to Castle Hill during the Relevant Period.  Those 18 advisory clients sent Castle Hill approximately $1.84 million.

27.    Brodacki and Castle Hill did not provide most of these 18 advisory clients with periodic account statements identifying the investments that they had purportedly made with the funds the advisory clients sent to Castle Hill, the amounts of those investments, or the performance of those investments.  Rather, because of the advisory clients' longstanding relationships with Brodacki and Castle Hill, and their trust in Brodacki and Castle Hill, the advisory clients expected Brodacki and Castle Hill to act in good faith on their behalf.

28.    In at least one instance in which an advisory client requested documentation of their investments through Castle Hill, Brodacki provided that client with fabricated account statements.  These fabricated account statements showed investments that did not exist, and increases over time in the value of investments that were never made.

29.    Through these actions, Brodacki and Castle Hill exploited the trust their advisory clients placed in them and breached their fiduciary duties to their advisory clients.  Most of the advisory clients had little to no investment experience, and some were retired or seriously ill.

**Examples of Misappropriation from Certain Advisory Clients**

**Advisory Client 1**

30.    Advisory Client 1 is a retired building contractor, aged 77, who lives on a fixed

income.  Advisory Client 1 entered into an Advisory Agreement with the Registered Adviser (doing business through Castle Hill) on or about June 22, 2019.  That Advisory Agreement contained all of the terms described above.  As part of this Advisory Agreement, Advisory Client 1 established brokerage accounts at the Custodian that were managed by Brodacki and Castle Hill.

31.    In the summer of 2022, when Advisory Client 1 was aged 74, Advisory Client 1 had a conversation with Brodacki about wanting to leave $100,000 to his sister when he died. Brodacki told Advisory Client 1 to send him the money and represented that he would create a separate account to benefit Advisory Client 1's sister.

32.    Accordingly, Advisory Client 1 sent two checks to Castle Hill, one for $50,000 on July 18, 2022 and the second for $50,000 on July 21, 2022.  These checks were deposited into Castle Hill's bank account.

33.    Brodacki did not initially tell Advisory Client 1 where the account for his sister would be established, but Advisory Client 1 assumed it would be held at the Custodian.

34.     Beginning by at least February 2023, Brodacki began sending periodic account detail reports to Advisory Client 1 by email.  Advisory Client 1 kept many of those reports, which arrived monthly, or near monthly.  Those account detail reports indicated that, in addition to accounts at the Custodian, Advisory Client 1 had an account or investment at "New England Note" that was valued at $100,000 as of February 9, 2023, and an investment at a small private social media company that was valued at $50,000 on the same date.  The beneficiary of the "New England Note" investment was listed as Advisory Client 1's sister.

35.    The account detail reports indicated that the purported value of the New England Note investment increased from $100,000 in February 2023, to $108,000 by September 2023, to

$124,000 by December 2024, and to $127,000 by July 2025.

36.     On information and belief, the company referred to as "New England Note" in these account detail statements does not exist.

37.     The Castle Hill bank statements indicate that, rather than making an investment with the $100,000 that Advisory Client 1 entrusted to Brodacki and Castle Hill to invest for his sister's benefit, Brodacki and Castle Hill spent that $100,000 to benefit themselves.  Specifically, at the time of Advisory Client 1's $100,000 deposit to Castle Hill's bank account, the account contained about $43,000, and an additional $13,000 was deposited from other sources.  Over the next month, all of those funds were spent or withdrawn leaving a balance of approximately $438. Expenditures of those funds included: $44,000 in transfers of funds to Brodacki's personal account or cash withdrawals, over $24,000 to a home improvement contractor, over $32,000 for Castle Hill's rent, over $14,000 to make payments on credit cards and loans, over $8,000 for dining and entertainment, and over $4,000 for travel.

**Advisory Client 2**

38.     Advisory Client 2 is a retired engineer, aged 73.  On information and belief, Advisory Client 2 is terminally ill.  Brodacki and Castle Hill were Advisory Client 2's investment adviser for approximately four years.  As part of that advisory relationship, Advisory Client 2 had a brokerage account at the Custodian that was managed by Brodacki and Castle Hill.

39.     In June 2023, Advisory Client 2 consulted with Brodacki about investing some extra money she had obtained.  Advisory Client 2 expressed that she wanted to invested in safe bank certificates of deposit.  Brodacki informed Advisory Client 2 that, instead of buying a bank certificate of deposit, he would purchase for her investments in non-bank notes or non-bank

9

bonds that would pay her a substantially higher interest rate than a bank certificate of deposit.

40.     Based on that conversation with Brodacki, Advisory Client 2 agreed that Brodacki would purchase notes or bonds paying 6% or 8% interest for her as an investment.  Brodacki told Advisory Client 2 to send him checks made payable to Castle Hill.

41.     On or about June 2, 2023 and again on or about July 29, 2024, Advisory Client 2 sent Castle Hill checks, each in the amount of $10,000, made payable to Castle Hill.  Advisory Client 2 understood that Brodacki and Castle Hill would use this $20,000 to purchase investments for Advisory Client 2 in notes or bonds paying 6% or 8% interest.

42.     Brodacki and Castle Hill did not provide Advisory Client 2 with any paperwork showing what bonds or notes they had purchased for her.  Based on her conversations with Brodacki after she sent the checks to Castle Hill, Advisory Client 2 assumed that Brodacki and Castle Hill purchased notes or bonds with her $20,000 and those notes or bonds were in her account managed by Brodacki and Castle Hill.

43.     On information and belief, Brodacki and Castle Hill did not purchase notes or bonds with the $20,000 they received from Advisory Client 2.

44.     The Castle Hill bank statements indicate that, rather than making an investment with the $20,000 that Advisory Client 2 entrusted to Brodacki and Castle Hill to invest for her benefit, Brodacki and Castle Hill spent that $20,000 to benefit themselves.

45.     The first $10,000 check from Advisory Client 2 was deposited into Castle Hill's bank account on June 9, 2023.  At that time, Castle Hill's account contained about $9,600.  By June 27, 2023, there was a negative balance of -$825 in Castle Hill's account.  Expenditures of those funds included: $11,000 in transfers to Brodacki's personal account, $1,600 in insurance payments, a $3,000 check to Brodacki and various other purchases.

10

46.     The second $10,000 check from Advisory Client 2 was deposited into Castle Hill's bank account on August 9, 2024.  At that time, Castle Hill's account contained about $100.  Over the next month, almost all of those funds were spent, leaving a balance in Castle Hill's account of approximately $900.  Expenditures of those funds included: transfers to Brodacki's personal account that then resulted in $2,600 in cash withdrawals, payments on credit cards or loans of about $2,800, Castle Hill office rent of about $900, dining and entertainment expenses of over $400, travel expenses of about $250, and a payment on another advisory client's life insurance policy of over $2,100.

47.     Advisory Client 2 never authorized Brodacki and Castle Hill to use her money for their personal expenses or for Castle Hill's office expenses.  Advisory Client 2 did not authorize Brodacki and Castle Hill to comingle her money with funds that did not belong to her.  Advisory Client 2 would not have sent her $20,000 to Brodacki and Castle Hill if she had known they would use some or all of it for personal or office expenses.

**Advisory Client 3**

48.     Advisory Client 3 is a phlebotomist, aged 56.  Advisory Client 3 worked with Brodacki as her investment adviser for about 24 years.  Advisory Client 3 entered into an Advisory Agreement with the Registered Adviser (doing business through Castle Hill).  As part of this Advisory Agreement, Advisory Client 3 established brokerage accounts at the Custodian that were managed by Brodacki and Castle Hill.

49.     In addition to working with Brodacki as her investment adviser, Advisory Client 3 considered Brodacki to be a friend.

50.     In the spring of 2025, Advisory Client 3 and Brodacki began having discussions about her making an investment into his business, Castle Hill.  Advisory Client 3 wished to

invest in Castle Hill because she believed that Castle Hill and Brodacki were successful based on his representations to her and the fact that she trusted him.

51.    To make her investment into Castle Hill, Advisory Client 3 gave four checks, each in the amount of $75,000 and made out to Castle Hill, to Brodacki.  The four checks, totaling $300,000, were all dated May 7, 2025, but were deposited by Castle Hill on May 8, 2025, May 12, 2025, May 23, 2025 and May 30, 2025.  In return, Advisory Client 3 agreed with Brodacki that she would be paid 8% interest on her investment in his business.

52.    Advisory Client 3 intended that one of the four checks that she gave to Brodacki, or $75,000, would not be part of her investment in Castle Hill, but rather a payment for past advisory services he had provided to her when her parent died.  Advisory Client 3 did not, however, document her separate intention for one of the four checks, and does not know whether Brodacki understood whether she was investing $300,000 or $225,000 in Castle Hill's business.

53.    Bank statements indicate that, rather than using Advisory Client 3's $300,000 or $225,000 as an investment in Castle Hill's business, Brodacki and Castle Hill spent her money for Brodacki's personal benefit.

54.    The $300,000 in checks from Advisory Client 3 were deposited into Castle Hill's bank account beginning on May 8, 2025.  At that time, Castle Hill's account contained about $39,000.  Other than about $120 in unrelated deposits, the $300,000 from Advisory Client 3 was the only money deposited into Castle Hill's bank account between May 2025 and the end of July 2025.  Over the two months, almost all of those funds were spent, leaving a balance in Castle Hill's account as of July 31, 2025 of approximately $1,600.  Expenditures of those funds included: payments of tuition for Brodacki's relatives of over $84,000, payments on credit cards or loans of about $66,800, a payment to another advisory client of over $10,000, payments to

Brodacki's in-laws of over $65,000, payments to Brodacki personally of over $20,000, dining and entertainment expenses of over $9,000, travel expenses of over $14,900, and cash withdrawals of over $14,000.

55.    Advisory Client 3 never authorized Brodacki and Castle Hill to use her money for their personal expenses.  Specifically, Advisory Client 3 did not authorize Brodacki to use her investment funds for tuition, for payments to relatives or other advisory clients, for payments to himself personally, for travel, or for cash withdrawals.  Advisory Client 3 would not have given $300,000 to Brodacki and Castle Hill if she had known they would use some or all of it as reflected in the bank records.

<strong>The Scope of Brodacki's and Castle Hill's Misconduct</strong>

56.    Brodacki and Castle Hill misappropriated funds from at least 18 advisory clients, who provided those funds to them for investment purposes.  Certain details concerning each of these instances of misappropriation are described in the chart below.

| Advisory Client | Age/ Occupation | Investment Amount/Date | Purported Investment | Repayment/ Date |
|---|---|---|---|---|
| 1 | 77, retired | $50,000 - 7/18/22<br>$50,000 - 7/21/22 | For investment in company New England Note for client's sister | $0 |
| 2 | 73, retired | $10,000 - 6/9/23<br>$10,000 - 8/9/24 | For investment in non-bank notes or non-bank bonds with an interest rate of 6% or 8% | $0 |
| 3 | 56, phlebotomist | $300,000 - 5/7/25 | For investment in Castle Hill to be repaid in 24 months with an 8% return | $0 |
| 4 | 37, sports agency recruiter | $50,000 - 9/2/25 | For investment at Brodacki's discretion in a note or bond earning 8% interest | $0 |
| 5 | 84, retired | $30,000 - 5/28/24<br>$50,000 - 7/29/24 | For unknown investment at Brodacki's discretion | $50,750 - 7/14/25 |
| 6 | 82, retired | $30,000 - 5/25/22<br>$20,000 - 9/6/22 | For unknown investment at Brodacki's discretion | $0 |
| 7 | 85, retired | $50,000 - 3/8/19 | For unknown investment at Brodacki's discretion | $0 |
| 8 | 75, retired | $15,000 - 2/12/20 | For unknown investment at Brodacki's | $0 |

| | | | discretion | |
|---|---|---|---|---|
| | | $20,000 - 2/22/21<br>$20,000 - 12/17/21<br>$25,000 - 3/8/24 | discretion | |
| 9 | 64 | $10,000 - 12/15/20<br>$25,000 - 8/18/21<br>$10,000 - 12/2/21 | For investment in stocks, including a $10,000 private equity investment and bonds at Brodacki's discretion | $10,500 - 6/27/25 |
| 10 | 78, retired | $6,000 - 8/16/18<br>$15,000 - 9/16/19<br>$150,000 - 6/28/23<br>$60,000 - 12/7/23<br>$20,000 - 3/14/24 | For investment at Brodacki's discretion, including for bonds | $101,500 - various dates from 1/30/23 to 11/13/25 |
| 11 | 74, retired | $64,000 - 10/1/18<br>$20,000 - 10/24/19<br>$6,500 - 10/29/19<br>$20,000 - 8/11/20<br>$20,000 - 10/27/22 | For investment in CDs or a fund with an interest rate higher than client's savings account | $0 |
| 12 | 54 | $303,585.68 - 1/27/23 | To "overfund" client's life insurance policy to have funds available to be invested at Brodacki's discretion when market was more favorable | $0 |
| 13 | 53, police officer | $25,000 - 5/8/24 | For private equity investment in social media company | $0 |
| 14 | 64 | $20,000 - 8/31/18<br>$50,000 - 5/17/19 | For unknown investment at Brodacki's discretion | $0 |
| 15 | 68, retired | $50,000 - 6/5/18 | For unknown investment at Brodacki's discretion | $0 |
| 16 | 63, retired | $25,000 - 4/15/24 | For unknown investment at Brodacki's discretion | $0 |
| 17 | 54, plumber | $80,000 - 12/5/22<br>$25,000 - 9/20/23<br>$10,000 - 4/16/25<br>$80,000 - 4/25/25 | For investment at Brodacki's discretion for retirement and for client's grandson | $0 |
| 18 | 74 | $20,000 - 1/3/25 | Investment in high-yield bank account with 5% interest rate for client's grandchildren | $0 |
| | **Totals** | **$1,845.085.68** | | **$162,750** |

57.     As the chart above demonstrates, over a nearly five-year period, Brodacki and Castle Hill promised to invest over $1.845 million on behalf of at least 18 of their advisory clients.  Over this same period, Brodacki and Castle Hill returned only $162,750 to those

14

investors, and most of those repayments were made using other advisory clients' funds that were entrusted to Brodacki and Castle Hill to invest on their own behalf, which is behavior typical of a Ponzi scheme.

58.     Bank records demonstrate that Brodacki and Castle Hill used little to none of these investment funds to make investments for their advisory clients.  Rather, bank records show that Brodacki and Castle Hill used these funds for Brodacki's personal expenses including numerous vacations, tuition, an exclusive club membership, fine dining, car-related expenses and his mortgage.  Bank records also show that some of the funds were used for Castle Hill's business expenses including office rent, technology expenditures and investment-related subscriptions.  Thus, the net losses by Brodacki's and Castle Hill's 18 advisory clients approximate $1.68 million.

59.     At the time Brodacki and Castle Hill misappropriated these advisory clients' funds, Brodacki and Castle Hill intended to, knew they were, or were reckless with regard to whether they were, breaching their fiduciary duties to their advisory clients.  Brodacki and Castle Hill knew that the funds entrusted to them by their advisory clients were for the purposes of investment and could not be used for their personal expenses.  With the exception of funds from Advisory Client 3, Brodacki and Castle Hill also knew that they could not use their advisory clients' funds for their business expenses.

60.     Even after Brodacki and Castle Hill were terminated by the Registered Adviser, they misled certain of their advisory clients about why they had ceased doing business with the Registered Adviser, asserting to at least one advisory client that they were no longer associated with the Registered Adviser because that firm was trying to steal their clients.  In September

15

2025, Brodacki and Castle Hill also accepted investment funds from at least one advisory client even though they were unaffiliated with a registered investment adviser at that point in time.

## FIRST CLAIM FOR RELIEF – FRAUD BY INVESTMENT ADVISERS

### Brodacki and Castle Hill Violated Section 206(1) of the Advisers Act

61.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 60 above as if set forth fully herein.

62.     During the Relevant Period, Brodacki and Castle Hill were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Brodacki and Castle Hill each were in the business of providing investment advice concerning securities for compensation.

63.     Brodacki and Castle Hill, acting intentionally, knowingly, or recklessly, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, employed a device, scheme, or artifice to defraud certain of their advisory clients.  In so doing, Brodacki and Castle Hill have breached their fiduciary duties.

64.     As a result, Brodacki and Castle Hill have violated and, unless enjoined, Castle Hill will continue to violate, Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## SECOND CLAIM FOR RELIEF - FRAUD BY INVESTMENT ADVISERS

### Brodacki and Castle Hill Violated Section 206(2) of the Advisers Act

65.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 60 above as if set forth fully herein.

66.     During the Relevant Period, Brodacki and Castle Hill were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].

16

Brodacki and Castle Hill each were in the business of providing investment advice concerning securities for compensation.

67.    Brodacki and Castle Hill, with knowledge, recklessness, or negligence, and while acting as investment advisers, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in transactions, practices, or a course of business which operated as a fraud or deceit upon certain of their advisory clients.  By doing so, Brodacki and Castle Hill breached their fiduciary duties.

68.    As a result, Brodacki and Castle Hill have violated and, unless enjoined, Castle Hill will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.    Permanently restrain Castle Hill, its agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal services or otherwise, and each of them, from violating Sections 206(1) and 206(2) of the Advisers Act by committing or engaging in specified actions or activities relevant to such violations.

B.    Order the Estate and Castle Hill to disgorge, with prejudgment interest, their ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint, on a joint and several basis, pursuant to Section 21(d)(5) and (7) of the Securities Exchange Act of 1934 [15 U.S.C. §78u(d)(5), (7)];

C.    Order Castle Hill to pay an appropriate civil monetary penalty pursuant to Section 209(e) of the Advisors Act [15 U.S.C. §80b-9(e)];

D.    Retain jurisdiction over this action to implement and carry out the terms of all

17

orders and decrees that may be entered; and

E.      Grant such other further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED: April 2, 2026

                                        Respectfully submitted,

                                        /s/ Kathleen Burdette Shields
                                        Kathleen Burdette Shields (BBO #637438)
                                        Louis Randazzo (New York Bar #2416485)
                                        Heidi Mitza (BBO #647909)
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Boston Regional Office
                                        33 Arch Street, 24th Floor
                                        Boston, MA 02110
                                        Phone: (617) 573-8904 (Shields direct)
                                        (617) 573-8958 (Randazzo direct)
                                        (617) 573-8929 (Mitza direct)
                                        (617) 573-4590 (fax)
                                        ShieldsKa@sec.gov, RandazzoL@sec.gov,
                                        MitzaH@sec.gov

18